We'll hear argument next in number 212281, Shelter Forest International Acquisition, against the United States. Ms. Thorsen. Good morning. May it please the court. My name is Maureen Thorsen and I'm appearing today on behalf of Appellants, the Coalition for Fair Trade in Hardwood, Iowa. This court should reinstate Thomas' rejection of Shelter's untimely data. Thomas' regulations state explicitly that it will not consider untimely filed questionnaire responses. The Tariff Act of 1930 also states that parties other than the mandatory respondents, like Shelter here, are subject to the same deadlines as the mandatory parties. Here, Shelter did not respond to the original questionnaires issued to the mandatory respondents. While Shelter filed a partial response to the supplemental questionnaires, it also acknowledged that those questionnaires sought all possible documentation concerning the issues therein, including a precise breakdown of resin materials in support of documentation. Instead of providing this data, Shelter referred the agency to its prior submissions, which did not contain the information. Shelter made no further attempts to provide information on its resins until July 3rd, 2019, more than four months after the supplemental responses were due, one month after the preliminary results were issued and only two weeks before the due date for case briefs. The lower court erred in requiring Commerce to accept this late data on remand and to give Shelter even further bites at the apple. Shelter was not attempting to correct clerical errors or similar technical mistakes. Rather, it was attempting to submit nearly 100 pages of completely new information responsive to Commerce's questionnaires, months after that information was due. Again, Shelter expressed concern. Hi, my understanding is in your appeal, you do not dispute that Section 1677 M.D. applies to Shelter Forest and but your position is that Shelter Forest did, in fact, get that second opportunity to to try to correct any deficiencies. Is that the correct understanding of your position as to Section 1677 M.D.? I think it's a little bit more nuanced than that, Your Honor. First of all, I do think that Shelter had multiple opportunities to timely file information and that it was aware of the deadlines and of the information being requested. Right. So just so I understand, it's your position that Commerce did, in fact, fulfill its statutory obligations to Shelter under 1677 M.D., is that right? Well, I believe that, again, I think it's a little bit more nuanced because I think because Shelter didn't respond to the original questionnaire, 1677 M.D. isn't really in effect here. If you look closely at the terms of that statute, it says if you respond to a questionnaire but your response is deficient, then Commerce needs to give you an opportunity to supplement. Does it say the word questionnaire in that statute? I believe it's request for information. Right. So let me double check. Respond to request. A request for information. So if the administering authority determines that a response to a request for information under the subtitle does not comply with the request, then typically the requests for information are in the form of questionnaires. Here, there was no response to the original questionnaire. I'm sorry, but why wasn't the supplemental questionnaire a request for information that is covered by 1677 M.D.? I think that's because if you look closely at 1677 M.D., it says if you do respond to a request for information and the supplemental response that you filed is deficient, then Commerce may disregard all parts of the original and subsequent responses. I think you cannot read reasonably this statute to require endless bites at the apple where every deficient supplemental requires another bite at the apple in perpetuity until such time as the department of Commerce is slain. But why does this case involve in perpetuity or anything like it? The first request for information to which Shelter responded is the only request for information to which Shelter responded. Putting aside what came before, it responded to the earlier ones, right? And so, Your Honor, I think that when you fail in response to your original request, don't get yourself outside of the section of 1677 M.D. Can you hear when we're talking or not? Yes, I can. Okay, well, I think you should, if I'm trying to say something or one of my colleagues, you should stop yourself, okay? Oh, sorry, Your Honor. So there's no argument here about the very initial things. I forget what the name is of the amount request or something that went to everybody. Quality evaluation. Quality evaluation, right? But then there's the first questionnaire response that went to the three named respondents, right? And Shelter did not respond to that. It wasn't asked to and it didn't. And the supplemental requests for information that went to, is it two of the three named respondents? Yes, Your Honor. That one Shelter responded to. Why is that not covered here? So that it wouldn't be absurd to read 1677 M.D. to say the first, that is, you don't have an endless series of corrections or demands for deficiency notice from the starting point of the first request for information that you respond to. Not the first request for information that somebody else respond to, the first that you respond to. Because respondents are not in charge of the proceedings. Respondents should not be permitted to pick and choose which questions and which questionnaires they're going to answer. And then when they don't get a result, they like cry out. But Commerce, in the fact, this is Judge Klovenger in the past, has in fact used 16, has satisfied 1677 M.D. when a voluntary, when a response has been made voluntarily. The position that Commerce took in this case is, well, you know, we do respond, we do deal with 1677 M.D. if we have time. No, Your Honor, I don't think that's a fair characterization here, particularly given how late in the game Shelter attempted to file this new information, that it only filed that information despite acknowledging exactly what Commerce was asking for at the time that it was originally due, and choosing simply not to provide it. It seemed to me— And then it waited four months to submit the information, and only after it became aware that its litigation strategy wasn't working for it. Ms. Thorsen, it seemed to me that the Court of National Trade found Commerce abused its discretion because it violated its obligations under 1677 M.D. That seems perfectly clear, and a violation of law is a classic abusive discretion. And so when this case was in front of the CIT the first time around, when the government was still in the case, they did not argue that 1677 M.D. did not apply because it can never apply to a voluntary response. They made the same arguments you did. It was late, et cetera, et cetera. And in your brief— Our argument—our argument has never been that 1677 M.D. can't apply to a voluntary respondent, but voluntary respondents are— Okay, well, can you stop right there? If we assume that 1677 M.D. applies to the response that was—voluntary response made by shelter, then I suppose your argument has to be that the violation of law was harmless error in this case. No, Your Honor. What I meant is that not that a voluntary response is not subject to 1677 M.D. I believe if you were a voluntary respondent in general and you answer the questionnaires as they come along, then you were grandfathered in 1677 M.D. Here, shelters did not file any response to the original questionnaire. Typically, even with a mandatory respondent, Congress does not treat a complete non-response as requiring notice of a deficiency under 1677 M.D. That's simply not the case. Shelter for us filed on October 5th, 18, a comment on the CPC data. What was that file? I believe what you might be referring to is their quantity and value questionnaire. No, I'm not. Their quality and value questionnaire, which they submitted, which is in joint appendix in 1889, refers to another document. That is to say, comments on the CPB data. Yes, that would have been a comment on which companies should have been selected as mandatory respondents. So Shelter is engaging in the process. They're both commenting on that, and then they're commenting on the quality and value questionnaire, right? Yes, so they answered the quantity and value questionnaire. However, my point of view is that the answer to the quantity and value questionnaire did not compel the agency to accept the late filed data or data that was filed months later. Shelter responded to all of the questions in the quantity and value questionnaire, and while Congress ultimately wasn't convinced of Shelter's claim as to the date on which it first started shipping inquiry goods, failure to persuade is not a deficiency that requires the agency to accept supplemental data. I think there's a distinction to be made as to what is a actual deficiency. If you make a claim that the agency disagrees with, that is not the same as a deficiency. However, in the supplemental questionnaire, Commerce, well, Shelter said, we acknowledge Commerce in this supplemental is requesting all possible documentation on our residents, and we are just going to bring you back. Ms. Thorsen, I feel like I'm hearing an argument that's a little different than the argument I saw in your blue brief. If I understood the argument in your blue brief, you were saying Commerce did fulfill its obligations under 1677MD with respect to Shelter because Shelter was watching all of the back and forth going on between the mandatory respondents in Commerce through the initial questionnaire responses and then the supplemental questionnaire came in. And so in that sense, as a witness to all of that, it had already gotten a preview of what the first bite of the apple looks like and what the second bite of the apple should look like. And under that kind of circumstances, if you squint a little bit, you could understand or should understand that Shelter did get an opportunity to cure any deficiencies by seeing how the mandatory respondents were able to get a shot at curing their deficiencies. But this morning, the argument I'm hearing from you is that it's something a little different, which is if you are a voluntary responder and you elect to respond only at the stage of the supplemental questionnaire and you decline to participate at the initial questionnaire stage, then you've essentially given up any right to have Commerce notify you of any deficiencies that may exist in your response to the supplemental questionnaire. And that particular argument, I did not see in your blue brief. Do you see the distinction? I do, Your Honor. And I think our argument that you mentioned from our blue brief holds as well. I know, but I'm trying to figure out what you preserved as an argument. Well, if the court finds that what has been preserved is the argument in the blue brief that you specifically described, well, we believe that that argument is sufficient here. Shelter was on notice of exactly what was asked for in both the original and supplemental questionnaires in its supplemental questionnaire response. It, in fact, lost what that information was and implied that it had already provided it. It said you have requested all possible documentation on the issues such as resin formula. Please look at what we have already filed. Then when it tried to submit supplemental data much later, it's simply out of luck. Four months later to take the position that, well, we understood what you asked for. We acknowledged what you asked for at the time of the due date, but decided not to present this information. Commerce is not under an obligation at that point to accept this new and untimely data. Commerce did not abuse its discretion by refusing to take that new, extremely late data on the record here. I see I'm nearly out of my time. I'll preserve what little I have left. OK. Thank you. Mr. Durling? Is that who we're about to hear from? Yes, Your Honor. I guess it's still a good morning. My name is James Durling, appearing on behalf of Shelter, Forrest, and the other appellees here. I'm dividing the argument with my colleague, Brian Senko, just as a general roadmap. I'll be addressing the issue about what information commerce could permissibly consider in making its redetermination. And then my colleague will address what that information shows and that substantial evidence actually supports commerce's redetermination. I'd like to jump right to the statutory provision. And I agree with the court that the statutory provision here is critical, because it really is the centerpiece of Judge Rustani's decision. And it's really the central issue here. And I just want to highlight a few key points about the statutory provision. The relevant provision, subsection D, speaks very broadly to any requests for information. And it covers all stages of any proceeding before the agency. I think the key language that I would direct the court to is subsection D refers specifically to for information under this subtitle. Why didn't Shelter respond to the initial questionnaire? Your Honor, because we had already provided all of the information that commerce had requested. When the petition was originally filed, we provided comments on the petition that included about 600 pages. Then why respond to the supplemental question? Because there was an issue we were trying to clarify. The other information on the records, Your Honor, which is on the glue. Yes. Basically, the only thing you said in response on the glue was, see what we said before. Because in our view, Your Honor, our belief was that what had been provided before was sufficient. Let me just clarify what was provided before. The supplemental question specifically asked the mandatory respondents to have a breakdown, ingredient by ingredient, of the percentage of their resin. Yes, Your Honor. Why didn't you just follow through with a straightforward response to a straightforward question? Because Shelter's submissions had been earlier in the process, quite extensive. And those are the submissions that commerce ultimately relied upon, Your Honor. When commerce made its determination. I don't understand the answer to my question. My question was, you had these very clear questions being directed at you. No. You saw the initial questions in the initial questionnaire to the mandatory respondents asking for precise information about their resins. And then you saw the follow-up questions in the supplemental questionnaire saying, no, what we mean is we want a percentage breakdown for each ingredient of which your resin is comprised. And so that's why I'm just wondering, after having seen all of that, why didn't you do what you were supposed to do in response to the supplemental questionnaire if you actually wanted to answer the questions provided by commerce in the supplemental questionnaire? Two reasons, Your Honor. One, actually, the supplemental questionnaire wasn't directed to us because we had not been formally designated as a voluntary respondent. That's true. But you very clearly were on notice what commerce was looking for when it came to the nature of the resin. Your Honor, we truly believe that what we had submitted already addressed the issue because let me just clarify, Your Honor. Did you break down percentage-wise the different ingredients that made up your glue? I don't think you did. The breakdown of the specific percentage had not happened yet, Your Honor. But we, at that point in time, still believed that what we had submitted, which was sworn testimony which commerce relied upon in its preliminary determination, sworn testimony that our glue was formaldehyde base, we thought that was sufficiently responsive to the question. It was only in the preliminary determination that commerce, for the first time, basically confirmed that they were accepting. Your Honor, I understand that this is your opinion. Yes, Your Honor. Basically, commerce accepted all of the information. Commerce, for the first time, identified a deficiency which was then directed to us. They had looked at our information, which is what sub D requires. If requests have been made, so parties give information, and if you have a concern about that specific information, the supplemental questionnaire was directed to deficiencies by the mandatory respondents. Commerce, at that point in time, had not addressed any deficiencies in what Shelter had submitted. The first time commerce said anything at all about deficiencies by Shelter was in the preliminary determination, and that's what we responded to. Could commerce have said, well, there's this volunteer called Shelter that is not truly established as a voluntary respondent that has submitted some information, but it's incomplete and we're not going to consider and evaluate it because Shelter did not go through the entire initial questionnaire, supplemental questionnaire process. Your Honor, they— Would that have been fine in the preliminary determination to focus only on the mandatory respondents? Commerce certainly had the option of rejecting the information Shelter had submitted. I'm just trying to get a yes or no answer to that question that I asked. I'm sorry, which is could commerce have the authority to do that? Yeah, in the preliminary determination, only analyze all of the information that it received from the mandatory respondents that they received through the initial and supplemental questionnaires plus anything else that they approved. The answer to your question is yes, but the key point is that is not what commerce chose to do. Instead, commerce chose to accept the information that Shelter had submitted, proceeded to analyze it as if Shelter were a mandatory respondent, even though it wasn't a mandatory respondent. And commerce then said, criteria one, you're fine. Criteria two, you're fine. Criteria three, you said formaldehyde base, but we needed evidence that it was majority formaldehyde. And for the first time, they identified the specific gap in the Shelter information, which they needed to resolve the issue. Wait a second. You're arguing that the 1677MD duty on commerce is triggered by the initial determination? No, Your Honor. It's written in the broadest possible terms. But in terms of how it functions, you're saying in this particular case, it was triggered because of commerce's failure to notify of the deficiency and give them a chance to cure after the preliminary determination? Well, no, Your Honor. It's Shelter submitted the information, which Shelter had represented as being sufficient. Shelter volunteered some information that the mandatories had given in specifics. They volunteered that information. Then they learned at the preliminary determination in August, sorry, you lose. Your information wasn't specific enough, right? Yes. And you're saying that's the point in time when the 1677MD duty on commerce triggered to say, you now have an additional time to come in and make a correction because after the preliminary determination. Yes, Your Honor. Doesn't that strike you as really odd? No, actually not, Your Honor. Because the point is deficiencies have to be directed to specific parties. What is deficient? Isn't the time for getting your act together before the preliminary determination? No, Your Honor. Because technically, I wouldn't say the obligation was triggered in the preliminary. The obligation was triggered before the preliminary when commerce decided it was going to look to Shelter's information and apply Shelter's information to the three criteria. Okay, can I ask you this question? So the three mandatory respondents submitted answers to the initial questionnaire. Is that right? Yes, Your Honor. And did any, and then commerce thought it needed more information. So it put out supplemental questionnaire, right? Yes. And did any of the answers that the mandatory respondents gave use language like the base of the glue? Not that I recall, Your Honor. My colleague may have a comment on that specific question. So I'll flag that for him. Not to my knowledge. Was there any reference to the base? But I guess what I'm trying to understand is whether the deficiencies that commerce identified in the answers to the mandatory respondents initial questionnaire put you on notice that to say that the following is the base of our glue would not suffice to answer the ultimate question about percentage ingredients. Your Honor, in our view, it was not sufficient to put us on notice because we were surprised in the preliminary determination. We were surprised that commerce decided to. But just to clarify, you don't know the answer to Judge Toronto's question as to what exactly were the responses about the glue or about the resin from the mandatory respondents to the initial questionnaire questions. Your Honor, I can't specifically speak to what each of the three mandatory respondents specifically said about the specific glue issue. OK. All I can speak to is what Shelter had submitted as information. Would you have had access to their answers? Did you have? I mean, theoretically, yes, Your Honor. But then that's... Is that because you're allies or because... No, no, no. It's because we have access under the Administrative Protective Order. So we did have access to the complete record. But I can tell you that it's not standard practice for when you're representing your client. It's not standard practice to analyze at the most microscopic level every response of every other party in the proceeding. I mean, in theory, we have access to the information. But your question was, was it reasonable? I think you understand this, but I guess what's in my mind, and maybe I'm thinking about this wrong, is if you had access to their response to the initial questionnaire, and if their initial questionnaire response used language of base similar to the language you had previously used, and if in response to that commerce said, we need more, that would make it awkward for you to then submit something that's just stuck with base. Let me respond to that briefly because I see I am out of time, and I do want to respect the time. I think it really comes down to page 17 of Commerce's preliminary decision. Because it wasn't just the base versus the majority. Commerce's real objection was basically, however, Shelter did not, I'm quoting here, however, Shelter, page 17. That doesn't help me. I'm sorry. I don't have with me the app page number. Initial determination? No, it's the preliminary determination by Commerce dated June 4th, 2019. My apologies if my colleague may have the app number. Preliminary determination memo? Yes. June 4th, 2019. Preliminary determination memo. Page 17? Yeah, page 17. That's it.  49.13. My apologies, Your Honor. Near the top? Near the bottom? Near the top. And the key sentence, Your Honor, is, however, Shelter Forest did not provide any documentation to support its assertion that it was made from a formaldehyde base. So the crux of the problem was Shelter put a fact in record, Commerce wasn't satisfied with the level of documentation that's very Shelter-specific. And this is the first time we had any notice at all of documentation. So what I'm understanding you to be saying is Commerce did not say a reference to base is not the same as a designation of ingredients. Yes, Your Honor. Or did it also say that? They wanted documentation of that fact. Of what fact? They're saying documentation that it was of, in fact, a formaldehyde, urea formaldehyde base. I'm sorry, I know that I'm taking your time. I take the significance of your quoting this to be the following. Commerce never said, when you say base, that doesn't give us the ingredient information. Rather, Commerce is saying, you're saying, you don't have the documentation of your base assertion. Not that a base assertion would not satisfy our initial request. That is correct, Your Honor. Okay. I'm happy to respond to any of the questions, but I see I'm over time. And so I'll conclude unless there are additional questions. Thank you. I perhaps should have asked, Mr. Derling, do you have anything to say about what, if any, significance we should attribute to the fact that the government is not here and didn't even say under protest when it entered its B-Man order? Are you prepared to? Yes, I am. Sorry, Your Honor, I'm happy to answer. Please. So we can't, Your Honor. I didn't catch your name. Good morning. May it please the Court, Brian Sanko on behalf of Plaintiff Appellees, Patriot Timber Products Incorporated, and Taraka Pacifica Incorporated. To answer your question, Your Honor, we can't look behind the lens and see why the government isn't here. But the key component is its remand determination wasn't under protest. So it wasn't protesting what the court asked to. Everything it found was based on the full record. So that's the key point to Your Honor's question. It also didn't say, having considered whether we should allow this information on discretion grounds, we would now exercise that discretion to consider this information even if we weren't under a order from the trade court saying that we are required to. It never said that, right? Correct. But I think, to Your Honor's point, is generally when you see these remands under protest, it would make such a statement saying, we don't think we were required to, but we have, and here is our analysis. And that is very important that they didn't say that, and they didn't get into that analysis. That's telling as it is. And as you heard from Mr. Durling, the Commerce established a fulsome record. Now I will discuss that record. And the coalition's attempt to have this court reweigh Commerce's factual determinations. This court should affirm the trade court's judgment because Shelter Forest established that inquiry merchandise was commercially available and therefore could not constitute later developed merchandise. Inquiry merchandise, as defined by the coalition, meets three criteria. Factual dispute here, as Mr. Durling discussed, and Your Honors have asked questions, relates to one issue, whether Shelter Forest demonstrated that its E0 glue consisted of majority of urea formaldehyde. Here, Commerce made a factual conclusion that Shelter Forest's E0 glue consisted of a majority of urea formaldehyde. This finding was supported by substantial record on the evidence demonstrated by the glue recipe report and also the glue inspection report submitted by Shelter Forest. And notably, there was substantial evidence, even without this information, that the coalition argues should be rejected. And that gets to Mr. Durling's point on Your Honors' question on the base. There was never any determination by Commerce that saying something was a urea formaldehyde base is not sufficient. They took issue with the fact that there wasn't, as Mr. Durling said, additional evidence on the record besides these declarations from these company officials. And that's what the trade court said. Well, if you are going to doubt that, you needed to seek more information because what's on the record answers your question. And to also answer Your Honors' question, the other respondents generally referred to urea formaldehyde glue or, and to that regard. And then Commerce considered the coalition's arguments and rejected them in favor of its reasonable conclusions, which were supported by substantial evidence. Notably, in the earlier panel, you actually didn't hear from arguments from my colleague regarding any of the facts. And that is key because as this court is readily familiar with the standard of review, the mere fact that it's possible to draw two inconsistent conclusions. Can I ask you one aspect of the issue about the soundness of Commerce's ultimate decision, putting aside the question of whether it should ever have had to make a new decision, is this inquiry merchandise, is that the phrase, were, even if they were present in what was available December 18th, 2016, if they were hidden, then the answer should be different because you have, obviously, if they're hidden, you can't expect the other, the challengers to identify them. Can you address that here? Sure. Of course, Your Honor. So the trade court properly considered that argument and rejected it. And they rejected it because there's no requirement in the statute or the regulations for Commerce to consider the subjective knowledge of a party alleging circumvention. And in Target Corporation, which is 609 F3D 1352, the Federal Circuit actually went through, and that's cited by the coalition, and went through and said Commerce's test, the statute isn't clear, the regulations aren't clear, so we're not in Chevron step one, we're in Chevron step two. They said Commerce's test was the presence in the market. And they found that to be reasonable. And the reason that it is presence and doesn't have a subjective... In Target or anywhere else where the ruling was made that Target, that the Commerce's test was reasonable, did anybody ever raise or the court address this question? Of hidden characteristics, which seems to raise a quite different policy question. Yeah, not to our knowledge, Your Honor. And that is simply because that's not the test. So there was no reason to have ever raised that. And the reason being is otherwise Commerce's commercial availability test would be subject to manipulation. As a factual matter, could the coalition, if it had known about some of these pieces of lumber, plywood, have bought one, tested it, and figured out what was, in the respect we're talking about, what was inside? Correct, they could have. But more to Your Honor's point, the trade secret that they're addressing is the inclusion of melamine, which gave Shelter Forest's product its waterproof characteristics. And that wasn't actually in one of the three criteria that they defined as inquiry merchandise. So this trade secret is actually- Isn't that the answer to the question? Isn't that the answer to the question? Yes. I mean, who cares? Exactly, Your Honor. Excuse me, why are we talking about melamine? Why are we talking about waterproofness at all? That is actually, Your Honor, the exact answer to the question, that it's irrelevant. And that's what Commerce found. That's what this court of international trade said. Correct. Yes, Your Honor, that melamine is irrelevant because you're looking at the underlying glue And as Shelter Forest established that Commerce upheld, the issue of melamine was in a completely separate production step. So it didn't even matter towards the trade secret. I see I'm running out of time. No, you, in fact, have run out of time. Yes. And I don't think we need to hear anymore. Okay, thank you, Your Honor. Ms. Thorsen. Your Honor, in rebuttal, Shelter was aware of the data that Commerce requested through the original questionnaires, through the supplemental questionnaires. And it was aware of the agency's precise requests in the supplemental questionnaires for resin component breakdown. It was Shelter's obligation to build a record in support of its claims. And I know, again, that in response to the- Ms. Thorsen, I'm interested in this point, that when, in the preliminary determination, Commerce said, here's what's unsatisfactory about the shelter evidence. It didn't say the reference to the base is insufficient to identify the ingredient list by percentage. It said, it's not sufficiently documented that, indeed, your product actually does use this base. What do you say about that? I say that in its questionnaires, Commerce was very clear that it didn't request just information. It requested backing documentation to support each statement that was being made regarding the resin. And what Shelter provided were statements that we have a resin that is of this base, and that it provided some documents that say nothing about what the resin composition is. They filed something called a Zeng declaration, right? Yes, they provided a declaration. But the declaration referenced supportive materials that did not, in fact, support what was in the declaration. I believe that was what Commerce was concerned with in the preliminary results. And in explaining why it was rejecting Shelter's late filed data, Commerce noted that it had given Shelter, or Shelter had multiple opportunities to supply information. And again, Shelter acknowledged in its own partial response to the supplemental questionnaires that what Commerce was seeking was all possible documentation in support of Shelter's claims regarding resin, regarding everybody's claims regarding resin. Shelter sat on its hands, even though it apparently had 100 pages of extra material it could have supplied. It chose not to do so. It's not the agency's job under 1677 MD to cure that kind of decision on Shelter's part, particularly here where Shelter didn't make a move to supply this information until it was very late in the game, merely two weeks before the cake briefs were due. With regard to some of the other information or argument by my colleagues, I don't think that the lack of the phrase under protest in Commerce's remand results is particularly meaningful here. Commerce was under a court order. Of course, it applied with that order. Whether it uses a particular term of phrase to signal disagreement with that order is not a particular moment in this appeal. So suppose in this case Commerce had, after getting the trade court's initial order, said we're under compulsion to do this, but in fact, having reconsidered the matter, we now will do this as a matter of our discretion. Would at that point we be reviewing the initial trade court remand decision? I'm not sure, Your Honor, but I also know those aren't the facts we have in front of us. I'd rather not speculate about cases that aren't in front of the court. I'll just close by saying after the remand determination itself, we disagree with Mr. Tchenko's claims for the reasons that we detailed in our briefs. And with that, I'll close my argument. Thank you very much. Thank you, and thanks to all the cases submitted.